IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT EUGENE McMANUS, JR., | ) | Case No. 1:17-cv-00789 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONEROF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

I.     **Introduction**

Plaintiff, Robert Eugene McManus, Jr. ("McManus"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ failed to properly (1) apply the treating source rule, (2) evaluate the opinions of the state agency examining psychiatrist and state agency reviewing psychologists, or (3) address in the RFC the claimant's limitations regarding interactions with supervisors, I recommend that the final decision of the Commissioner be VACATED and this matter be REMANDED pursuant to 42 U.S.C. §405(g).

II.     **Procedural History**

McManus applied for DIB on May 8, 2015 alleging a disability onset date of April 4, 2014. (Tr.14, 165-66) McManus alleged disability based on asthma, high blood pressure,

depressive disorder, and generalized anxiety disorder.  (Tr. 199)  McManus's application was denied initially on November 24, 2015, and on reconsideration on April 27, 2016.  (Tr. 14, 91, 98)  McManus filed a written request for rehearing on May 3, 2016.  (Tr. 10)  Administrative Law Judge Peter Beekman heard the case on October 24, 2016.  (Tr. 34-59)  The ALJ denied McManus's claim on December 14, 2016.  (Tr. 11)  The Appeals Council denied further review on February 21, 2017, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3)

### III.    Evidence

McManus now raises three arguments: (1) the RFC is legally deficient because it fails to address McManus's inability to interact with supervisors and/or tolerate supervision; (2) the ALJ's evaluation of the medical opinion evidence is legally insufficient, resulting in an RFC that is not supported by substantial evidence; and (3) the RFC does not reflect McManus's need to be off-task due to panic attacks multiple times per week.  ECF Doc. 13, Page ID# 579.  Because the issues are limited, it is not necessary to summarize the entire record.

### A.    Personal, Educational and Vocational Evidence

McManus was 45-years-old on the date of the hearing.  (Tr. 35)  McManus has a bachelor's degree in psychology and has worked as a product consultant and as a sales person. (Tr. 35, 167-68.)  During the pendency of his claim, McManus also worked as a clerk processor at Goodwill.  (Tr. 43)

### B.    Medical Records Related to McManus's Mental Conditions

Although McManus's DIB application contended he was disabled due to hypertension and asthma, he has raised no argument concerning the Commissioner's handling of those issues. The following records bear upon his claim to be disabled because of depression and anxiety.

On May 16, 2014, Mary Ellen Behmer, M.D., McManus's primary care physician, diagnosed him with anemia, and ordered gastrointestinal testing.  (Tr. 268-69)  McManus did not complain of anxiety or depression.  (*Id.*)

On April 25, 2015, Dr. Behmer saw McManus for a follow-up visit.  (Tr. 266)  McManus told his doctor that he'd had lifelong issues with anxiety and depression, but the doctor noted these had never been mentioned to her.  (*Id.*)  She noted that McManus was "much more anxious and more depressed."  (*Id.*)  Dr. Behmer recommended psychiatric counseling and prescribed Paxil.  (*Id.*)  Upon examination, Dr. Behmer found McManus's affect was appropriate and congruent, his base emotion was neutral, and his thought content and process exhibited logical connections.  (Tr. 267-68)  Dr. Behmer diagnosed McManus with depressive disorder and general anxiety disorder.  (*Id.*)  This was McManus's first psychological-condition diagnosis.

On June 5, 2015, Dr. Behmer saw McManus for a follow-up visit.  She noted McManus's generalized anxiety disorder had been doing "okay," but she noted he had not started Paxil because he was anxious about the side effects.  (Tr. 263)

On November 10, 2015, McManus established a treatment relationship with psychiatrist Lisa Lawrence, M.D.  (Tr. 399)  McManus reported symptoms including sad mood, crying spells, low energy and motivation, weight loss, lack of trust in other people, worry, and irritability.  (*Id.*)  McManus reported that he would wake up feeling exhausted as though he had not slept, and he indicated that he used to wake up at night with anxiety and panic.  (*Id.*)  McManus told Dr. Lawrence he had dealt with depression most of his life, at times with vegetative symptoms.  (*Id.*)  She also noted that McManus's symptoms included irritability, uncontrollable worry that interfered with his sleep and made him feel irritable, experience panic attacks, sweating, tight chest, fast heart rate, dizziness, and shortness of breath.  (*Id.*)  Dr.

3

Lawrence noted McManus had not received treatment for his mental health conditions, other than high school psychologists, and had taken no medications other than the Paxil his primary care physician had recently prescribed.  (Tr. 399)  Dr. Lawrence noted that after taking Paxil for several months, McManus was still anxious and depressed, but was sleeping better through the night and experienced fewer headaches.  (Tr. 400)  McManus reported he had experienced verbal and emotional abuse as a child.  (*Id.*)  Dr. Lawrence noted positive findings for chest pain and shortness of breath.  (Tr. 401)  Dr. Lawrence prescribed an increased Paxil dosage and continued counselling.  (*Id.*)

On November 12, 2015, McManus saw Dr. Behmer to obtain an influenza vaccination. (Tr. 431)  During her evaluation of McManus, Dr. Behmer found that his generalized anxiety disorder was under "good control."  (Tr. 435)

On December 10, 2015, Dr. Lawrence evaluated McManus's depression and anxiety. (Tr. 405)  McManus reported that the increased Paxil dose had not helped his anxiety or depression and had caused headaches and teeth clenching.  (*Id.*)  He reported the same level of sadness, crying spells, anxiety, and worry, that his energy and motivation were still low, that he had panic attacks several times per week, and that his headaches had worsened as he took Paxil. (*Id.*)  He reported passive thoughts of wanting to die in his sleep, but no suicidal thoughts.  (*Id.*) McManus reported he tried to watch TV and used his computer.  (*Id.*)  Dr. Lawrence again increased McManus's Paxil dosage.  (*Id.*)

On December 17, 2015, McManus saw pulmonary specialist Valerie Ross, CNP regarding his broken CPAP machine.  (Tr. 384)  During her examination, she noted that McManus's general appearance was alert, pleasant, and showed no distress.  (Tr. 387)

4

On January 7, 2015, Elizabeth Petitt, N.P. evaluated McManus.  He reported that he fell asleep "OK," but tended to get up in the middle of the night, did not know what caused him to wake, and was apprehensive when he woke.  (Tr. 407)  McManus reported having anxiety and fatigue and that he ground his teeth.  (*Id.*)  McManus reported that he lived on his own and did his own shopping, cooking, laundry, etc.  (*Id.*)  Nurse practitioner Petitt prescribed McManus Vistaril and continued use of Paxil.  (Tr. 408)

On January 20, 2016, McManus reported to Dr. Lawrence that he was more depressed and had daily thoughts of wishing he were dead, but no intentions to act on them.  (Tr. 409)  He reported that he felt tired, had trouble falling asleep, would wake during the night, and looked forward to napping after he woke up in the morning because he didn't feel refreshed.  (*Id.*)  They discussed adding Wellbutrin for McManus's depression.  (*Id.*)  McManus reported problems with his focus and concentration, including trouble focusing on television programs.  (*Id.*)  He also reported difficulty concentrating at work in the past.  (*Id.*)  He also reported some general paranoia.  (*Id.*)  Dr. Lawrence diagnosed anxiety, depression, insomnia, and occasional night sweats and prescribed Wellbutrin and once again increased his dosage of Paxil.  (Tr. 409-10)

On February 17, 2016, McManus told Dr. Lawrence of his fatigue and grogginess problems.  (Tr. 411)  He reported Wellbutrin helped initially, but his condition later regressed to his pre-medicated state.  (*Id.*)  He reported diminished appetite, no improvement in motivation, depression, or focus, and constant paranoia.  (*Id.*)  Dr. Lawrence prescribed increased Wellbutrin and Paxil dosages and Seroquel or Abilify for augmentation.  (*Id.*)

On March 16, 2016, Dr. Behmer saw McManus for "extreme fatigue" lasting six months despite sleeping for eight hours.  (Tr. 374)  On examination, Dr. Behmer noted that McManus appeared fatigued but his test results only showed that he had low iron.  (Tr. 377)

5

On March 17, 2016, McManus reported to Dr. Lawrence that Propranolol stopped the hand tremors that had developed with Abilify, but did not help with his anxiety.  (Tr. 413)  He reported Vistaril made it hard for him to sleep.  (*Id.*)  McManus reported Wellbutrin and Abilify also troubled his sleep and made his panic attacks worse as the dosages were increased.  (*Id.*)  McManus reported that his depression was worse; his worrying was the same or worse; that he always felt paranoid, and his energy and motivation were low.  (*Id.*)  However, labs that checked for fatigue indicated no problems.  (*Id.*)  McManus reported thoughts of not wanting to wake up, but that he had no plans or intentions to harm himself.  (*Id.*)  Dr. Lawrence prescribed continued propranolol, a lower dosage of Wellbutrin, increased Vistaril at night for sleep, melatonin, and increased Paxil.  (Tr. 414)

On April 12, 2016, Dr. Lawrence noted that McManus was "[g]etting out a little bit" and had been to coffee shops with a community psychiatric support treatment ("CPST") individual.  (Tr. 423)  McManus reported his frequency of panic attacks, worry, paranoia, depression, and anxiety were about the same.  (*Id.*)  Dr. Lawrence prescribed immediate release Wellbutrin at a higher dose, a different SSRI than Paxil, and continued use of Vistaril and Abilify.  (*Id.*)

On May 9, 2016, McManus saw Dr. Lawrence and reported that Wellbutrin IR made him irritable.  (Tr. 488)  McManus reported that his depression and anxiety were worse and that he had thoughts of wanting to die in his sleep, but no plans or intentions to act.  (*Id.*)  McManus reported that he went to coffee shops with his CPST.  (*Id.*)  McManus reported that Vistaril was making him groggy, but he thought it was helping his panic attacks to some degree.  (*Id.*)

On June 9, 2016, McManus told Dr. Lawrence that he was going to be evicted from his apartment due to non-payment and would stay with his father temporarily.  (Tr. 490)  McManus reported that his irritability was better with a new formulation of Wellbutrin, but his depression

and anxiety were worse, possibly due to the eviction.  (Tr. 490)  Dr. Lawrence prescribed

increased Zoloft, and continued use of propranolol, Wellbutrin, and Abilify and recommended

that McManus continue with CPST and counselling services.  (Tr. 491)

On July 3, 2016, McManus received his 30-day employment review at Goodwill.  (Tr.

495)  McManus was found to be "below expectations," because he was working at a slow pace.

(Tr. 495-497)  McManus was told to improve his work speed and smile, greet, and engage

himself with customers.  (Tr. 498)

On July 14, 2016, McManus told Dr. Lawrence that he was staying with his father and

taking art therapy.  (Tr. 503)  He reported his insomnia had increased, and his paranoia, low

energy, depression, and anxiety were the same.  (*Id.*)  McManus told Dr. Lawrence about his

Goodwill job and his poor performance because he was too slow, did not follow instructions, and

would "freeze up" from anxiety.  (*Id.*)  Dr. Lawrence prescribed increased melatonin, continued

Vistaril, Wellbutrin, and Zoloft and recommended individual BH counseling and CPST service.

(*Id.*)

On August 4, 2016, Dr. Lawrence noted that there was no difference in McManus's

depression, worry, or panic attacks with increased Zoloft.  (Tr. 505)  McManus reported that his

job was not going well.  (*Id.*)  McManus reported that he was working 25-29 hours a week, his

anxiety was "pretty bad," he had a hard time getting through his shift, would feel exhausted later

in the day, and found it hard to stay awake.  (*Id.*)  McManus reported feeling some anger toward

his bosses, but that he would not hurt them.  (*Id.*)

On August 23, 2016, McManus requested that Dr. Lawrence provide him with an excuse

to get him out of jury duty, indicating that his panic attacks were worse due to his jury summons.

(Tr. 507)  In a September 2, 2016 visit with Dr. Lawrence, McManus reported that his second

work review indicated his work pace was too slow, and he told her he thought he would be fired for lack of enthusiasm and pace.  (Tr. 507, 509)

### C.    Opinion Evidence

#### 1.    Kandice Dietrick – Counselor

On April 5, 2016, McManus's counselor, Kandice Dietrick, completed a daily activities questionnaire.  (Tr. 418-19)  She noted that McManus lived in an apartment alone, had little to no contact with family, friends, or neighbors, and only visited his family occasionally on holidays for one hour.  (Tr. 418)  She noted that McManus kept to himself and avoided social interaction.  (*Id.*)  She noted that McManus had many conflicts with his supervisors and co-workers and had a difficult time following directions.  (*Id.*)  She noted McManus had been fired from multiple jobs due to performance and attendance problems, interoffice conflict, and for not following instructions properly and had not recently made an attempt to return to work.  (*Id.*)

Dietrick opined that McManus did not cook meals for himself or others due to lack of motivation.  (Tr. 419)  She noted that McManus reported that he avoided all chores on a daily basis, only vacuumed once every four months, only showered once every seven to ten days, drove only when necessary and only at night to avoid traffic, avoided shopping for as long as he could, didn't pay his bills on time or keep up with banking, and had no hobbies.  (*Id.*)  Dietrick noted that the Centers for Family and Children assisted McManus with his transportation and community needs.  (*Id.*)  She noted that McManus was seen weekly for case management and counseling and monthly by a psychiatrist and was reliable 95% of the time.  (*Id.*)  She noted that McManus received community supportive treatment and cognitive behavioral treatment, was medication compliant, did not have behavioral issues, and was mostly cooperative.  (*Id.*)  She noted that she first saw McManus in November of 2015 and last saw him on April 5, 2016.  (*Id.*)

### 2.  Lisa Lawrence, M.D. – Treating Psychiatrist

On April 12, 2016, Lisa Lawrence, M.D. completed a mental status questionnaire.  (Tr. 428)  She noted that McManus displayed a casual appearance and decreased eye contact, and spoke with a soft voice.  (Tr. 428)  She found his mood was depressed and anxious and he had an appropriate affect.  (*Id.*)  Dr. Lawrence noted McManus's symptoms included sweating, tightening of his chest, fast heart rate, and shortness of breath.  (*Id.*)  She noted that McManus did not trust people and was "always paranoid."  (*Id.*)  Regarding McManus's cognitive functioning, Dr. Lawrence stated McManus had difficulty focusing when he read or watched television, was slow at processing, and had average to above-average intelligence.  (*Id.*)  She noted that McManus's insight and judgment were fair.  (*Id.*)  Dr. Lawrence diagnosed McManus with major depression, general anxiety disorder, panic disorder, and social anxiety disorder.  (Tr. 429)  She found McManus had a fair ability to maintain attention and remember, understand, and follow directions, but had poor completion of tasks and difficulty reading and watching television.  (*Id.*)  She noted McManus was extremely uncomfortable in and avoided social situations and found it difficult to adjust to change.  (*Id.*)  Dr. Lawrence opined that McManus would likely work too slowly and make mistakes.  (*Id.*)

On July 14, 2016, Dr. Lawrence completed a second mental impairment questionnaire. (Tr. 499-500)  Dr. Lawrence diagnosed McManus with major depression, general anxiety disorder, panic disorder, and rule out social anxiety disorder.  (Tr. 499)  Dr. Lawrence stated that the clinical findings that demonstrated the severity of McManus's mental impairment and symptoms were depressed affect, decreased eye contact, depressed and anxious mood, paranoia, and speaking in a soft voice.  (*Id.*)  Dr. Lawrence opined that McManus's prognosis was fair. (*Id.*)  Dr. Lawrence opined that McManus was seriously limited, but not precluded from being

able to: carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; manage regular attendance and be punctual within customary allowances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*) She opined McManus would be unable to meet competitive standards regarding his ability to carry out detailed instructions and complete a normal workday and workweek without interruptions from psychologically based symptoms.  (*Id.*)  Dr. Lawrence opined that McManus had a limited but satisfactory ability to remember locations and work-like procedures, but was seriously limited, but not precluded from being able to understand and remember very short and simple instructions or detailed instructions.  (Tr. 500)  Dr. Lawrence opined McManus was unable to meet competitive standards in his ability to interact appropriately with the general public, but was seriously limited, but not precluded from being able to: ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (*Id.*)  Dr. Lawrence opined McManus had a limited but satisfactory ability to be aware of normal hazards and take appropriate precautions and was seriously limited, but not precluded from being able to respond appropriately to changes in a work setting and set realistic goals or make plans independently of others.  (*Id.*)  Dr. Lawrence opined that, on average, McManus would be absent from work four days each month and be off task at work greater than 50% of an eight-hour workday due to his impairments or treatment.  (*Id.*)

### 3.  Deborah Koricke, Ph.D. – State Agency
### Psychological Consultative Examiner

On November 4, 2015, clinical psychologist Deborah Koricke, Ph.D. prepared a

consultative disability assessment report.  (Tr. 362)  Dr. Koricke noted that McManus was

difficult to engage during the interview.  (Tr. 362)  McManus provided detailed information

concerning his work and life history.  (Tr. 363-365)  Dr. Koricke found that McManus was

cooperative and persistent during the interview.  (*Id.*)  She found that McManus did not exhibit

any significant speech problems, his speech was 100% intelligible, he was fairly articulate, and

his thoughts were organized and coherent.  (Tr. 366)  She found McManus had no difficulty

expressing himself and found there were no signs of tangential or loose associations.  (*Id.*)

Dr. Koricke found McManus made good eye contact but had a blunted affect.  (*Id.*)  Dr.

Koricke found McManus did not appear anxious during the assessment.  (*Id.*)  She found

McManus was conscious, alert, and fully oriented during the exam and that his memory for his

history was "ok."  (Tr. 366)  She found: McManus was functioning within the estimated average

range of intelligence functioning; his thinking was reality bound; and he was able to complete

serial threes and sixes forward and backward with minimal effort.  (*Id.*)

Dr. Koricke found McManus demonstrated good insight into his situation.  (*Id.*)  She

opined that while he showed good judgement during the evaluation, his reported history of

employment difficulties indicated he had the potential for fair-to-poor judgment.  (Tr. 367)  Dr.

Koricke opined that McManus appeared able to seek medical or psychiatric attention, if needed,

and McManus reported he was compliant with his medications.  (*Id.*)

Dr. Koricke diagnosed McManus with generalized anxiety disorder, avoidant personality

disorder, and recurrent, moderate major depressive disorder.  She found he presented as shy and

timid.  (*Id.*)  She noted that although McManus reported medical and psychological difficulties,

11

he provided no medical documentation or records for her to review to confirm his reports. (*Id.*)

Dr. Koricke opined that McManus was likely to have difficulty recalling what needed to be done

in the work place to follow through with completing tasks and may demonstrate difficulty with

judgment while in the work place due to depression and anxiety. (Tr. 368) She opined that

although McManus's abilities in maintaining attention and concentration did not seem to be

hindered during the interview, they could be hindered if he did not maintain counseling. (*Id.*)

Dr. Koricke opined that McManus lacked the "judgment and insight to function appropriately in

the work setting." (Tr. 368) She noted that McManus's life stressors included his health

problems, financial strain, his history of avoiding most interpersonal relations, his inability to

maintain employment due to depression and anxiety, and his avoidant personality disorder. (Tr.

369) Dr. Koricke noted, "He presented shy today and was not fully able to gain appropriate

rapport based on his avoidant personality disorder, and depression/anxiety." (*Id.*)

### 4. Judith Schwartzman, Psy.D, and Kathleen Malloy, Ph.D. – State Agency Psychological Consultants

On November 23, 2015, Judith Schwartzman, Psy.D, performed a mental residual

functional capacity assessment from McManus's medical history. (Tr. 68-70) On April 22,

2016, Kathleen Malloy, Ph.D., also performed a mental residual function capacity assessment

from the medical history. (Tr. 85) Because Drs. Schwartzman and Malloy reached the same

conclusions regarding McManus's mental limitations, I will only summarize Dr. Malloy's

opinion below. (Tr. 68-70, 85-86)

Dr. Malloy opined that McManus did not have any understanding or memory limitations.

(*Id.*) She opined that McManus was not significantly limited in his abilities to: carry out detailed

instructions; sustain an ordinary routine without special supervision; work in coordination with

or in proximity to others without being distracted by them; and make simple work-related

decisions. (Tr. 85-86) She opined there was no evidence of any limitation in McManus's ability to carry out very short and simple instructions. (*Id.*) She opined that McManus had sustained concentration and persistence limitations and was moderately limited in his abilities to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance; be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) Dr. Malloy further opined that McManus could carry out 1-4 step tasks in situations in which duties are relatively static and changes could be explained ahead. (Tr. 86) She opined that when McManus's symptoms increased, he would occasionally need flexibility in his work schedule, breaks, and pacing. (*Id.*)

Dr. Malloy opined that McManus was not significantly limited in his abilities to: ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 86) She opined that McManus was moderately limited in his abilities to interact appropriately with the public and accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Dr. Malloy opined that McManus's interactions with the public, coworkers, and supervisors should be brief, infrequent, and superficial and that supervisors would need to offer constructive criticism and be supportive when McManus's symptoms increased. (*Id.*)

Dr. Malloy opined that McManus was moderately limited in his ability to respond appropriately to changes in the work setting, but was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, his ability to travel in unfamiliar

13

places or use public transportation, or his ability to set realistic goals or make plans independently of others.  (*Id.*)  She opined that McManus's symptoms would exacerbate in the face of perceived stressors, but he could adapt to a setting in which duties were routine and predictable.  (Tr. 87)  She opined that McManus would need advanced notice of major changes and a gradual implementation to allow him time to adjust.  (*Id.*)  At the time Drs. Malloy and Schwartzman conducted their record reviews, most of the history from McManus's interactions with his treating psychiatrist had not yet occurred.

> ### D.    Testimonial Evidence
>
> #### 1.    Claimant's Testimony

At the October 24, 2016 hearing, McManus testified that he selected April 4, 2014 as the disability onset date because he was terminated from Moen for poor performance on that date. (Tr. 36)  McManus stated that he tried to work as a clerk processor at Goodwill in 2016, but was terminated for performance there as well.  (Tr. 36, 43)  McManus stated that it was traumatic for him to receive his work evaluation at Goodwill because the conversation was negative and made him feel terrible and very inadequate.  (Tr. 44)  McManus had worked full-time at Goodwill for two months, but later requested part-time work due to stress and fatigue.  (Tr. 45)  Goodwill terminated him on September 27, 2016.  (Tr. 46)

McManus testified that he felt he was disabled because anxiety and depression affect his work performance so much that he is unable to keep a job.  (*Id.*)  He stated he would "freeze up" from anxiety and be unable to work at a fast enough pace.  (*Id.*)  He stated he was also defensive and paranoid, which made him unable to get along with supervisors and coworkers.  (*Id.*)  He stated that just being observed or being in a job setting caused him stress and made it difficult for

14

him to focus on what he was doing.  (*Id.*)  McManus stated that he described himself as paranoid because he had the general feeling that people are against him.  (Tr. 39)

McManus stated he lived with his father.  (Tr. 37)  He stated that he waited until November of 2015 to start psychiatric treatment, because he avoids people and situations, was scared to talk about himself, and was unaware that he had signed up for Medicaid when he stayed overnight at a hospital for chest pains in May, 2014.  (*Id.*)  McManus stated that he had obtained Paxil from his medical doctor prior to November, 2015.  (Tr. 42)  McManus stated he began taking medications for his psychiatric conditions around June of 2015.  (Tr. 43)  McManus stated he saw Dr. Lawrence every month.  (Tr. 38)  He stated he was present and spoke with Dr. Lawrence about his limitations on July 14, 2016, when she filled out the impairment questionnaire.  (Tr. 38-39)

McManus stated that he watched television for fun.  (Tr. 38)  He stated that he would record one-hour long TV shows and then watch them three to four times, because he had a hard time focusing and understanding the plot.  (Tr. 43)  McManus stated that he would try to drive and shop at night to avoid being in close proximity to others.  (Tr. 47-48)

McManus stated that he was not taking his prescribed medications in April of 2015, because he had put off getting the help that he needed due to his tendency to avoid people and situations.  (Tr. 40)  At the time of the hearing, McManus stated he was taking Wellbutrin, Lexapro, Abilify, Propanolol, Vistaril, and Zoloft.  (Tr. 40)

McManus stated that when he had a panic attack, he would sweat most of the time, "get very tight in the chest, feel a rapid heartbeat, and get light-headed."  (Tr. 41)  He said that although he would sometimes wake up in the middle of the night and have a panic attack, his attacks were usually triggered by his fear of a situation, would usually last from a quarter to half

15

an hour or more, and that he would usually lay down until the attack ended.  (Tr. 41-42)

McManus stated that when he experienced panic attacks at work at Goodwill and Moen he

would stay in the bathroom until he could recover.  (*Id.*)

### 2.    Vocational Expert's Testimony

The ALJ asked VE Stephen P. Davis whether a 45-year-old male, with the following

background and limitations could perform any of McManus's former jobs: the same educational

and work background as Mr. McManus; no exertional, postural, manipulative, visual, or

communication limitations; should avoid high concentrations of smoke, fumes, pollutants, and

dust; should do no complex tasks; and who should have only occasional and superficial

interactions with the public and coworkers, but can do simple, routine, low-stress tasks that do

not involve high production quotas, piece grade work, arbitration, confrontation, negotiation,

supervision, commercial driving, or work changes.  (Tr. 51)  The VE testified that the

hypothetical individual could perform product sorter and apparel stock checker jobs, in addition

to other jobs McManus had not performed in the past, like a shipping and receiving weigher,

lamination inspector, and lens block gauger.  (Tr. 51-52).

The ALJ asked the VE a second hypothetical that was the same as the first, except the

hypothetical individual was unable to have any interaction with the public.  (Tr. 52)  The VE

stated that there was no interaction with the public for any of the jobs he had identified, and not

being able to have interaction with the public would not be a factor.  (Tr. 53)

On cross-examination, the VE testified that work would be precluded for a hypothetical

individual who would be off task greater than fifty percent of an eight-hour work day or who

would have to miss work four times per month.  (Tr. 53)  The VE also admitted that work would

be precluded for a hypothetical individual who was only able to work at half of an expected work

16

pace.  (Tr. 54)  The VE testified that a hypothetical individual with the limitations described by the ALJ who also would have panic attacks that lasted half an hour each and who would require additional support and reminders could still find work because thirty minutes was within acceptable parameters for being off task.  (Tr. 55)  Finally, the VE testified that a hypothetical worker who needed flexible scheduling and pacing and who required breaks twenty-five percent of the day would not be able to meet production standards.  (Tr. 58)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.     The ALJ's Decision

The ALJ's December 14, 2016 decision contained the following paraphrased findings:

1. McManus met the insured status requirements of the Social Security Act through December 31, 2019. (Tr. 16);

2. McManus had not engaged in substantial gainful activity since April 4, 2014, the alleged onset date (20 CFR 404.1571 et seq.). (Tr. 16);

3. McManus had the following severe impairments: major depressive disorder, generalized anxiety disorder, avoidant personality disorder, asthma and obstructive sleep apnea (20 CFR 404.1520(c)). (Tr. 16);

4. McManus did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526). (Tr. 17) McManus had a moderate restriction in activities of daily living. (Tr. 17) McManus had marked difficulties in social functioning. (Tr. 18) McManus had moderate difficulties in maintaining concentration, persistence or pace. (Tr. 18) There was no evidence of episodes of decompensation. (Tr. 18);

18

5. After careful consideration of the entire record, the ALJ found that McManus had the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations:  He should avoid high concentrations of smoke, fumes and pulmonary irritants.  He can perform simple (routine) tasks with no high production quotas or piece rate work.  He can perform low stress work.  He should not be involved with arbitration, confrontation, negotiation or supervision.  He should not perform commercial driving.  He can have superficial interaction with the public and coworkers.  He can have few workplace changes. (Tr. 19);

6. McManus was capable of performing past relevant work as a stock checker and product sorter.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).  (Tr. 25);

7. McManus had not been under a disability, as defined in the Social Security Act, from April 4, 2014, through the date of the decision (20 CFR 404.1520(t)).  (Tr.27).

Based on these findings, the ALJ determined that McManus was not disabled through December 14, 2016, the date of this decision.  (Tr. 27)

## VI.    Law & Analysis

McManus alleges that the RFC is not supported by substantial evidence due to three errors: (1) the RFC failed to address McManus's inability to interact with supervisors and/or tolerate supervision; (2) the ALJ failed to properly evaluate the medical opinion evidence; and (3) the RFC failed to reflect that McManus will be off-task due to panic attacks multiple times per week.  For the convenience of the court, the undersigned discusses the errors in a different order than presented by McManus.

### A.    Standard of Review

This court's review is limited to determining whether substantial evidence in the record supports the ALJ's findings and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");
*Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because substantial evidence in the record supports a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999). "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. If not, reversal is required, unless the error of law was harmless. *See, e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    The ALJ Failed to Properly Evaluate the Opinions of Dr. Lawrence

McManus argues that the ALJ violated the treating physician rule by giving treating psychiatrist Dr. Lawrence's April 12, 2016 opinion "considerable weight," but failing to account for Dr. Lawrence's opinions that McManus: only had a "fair" ability to remember, understand, and follow directions, and maintain attention; was poor at completing tasks, and had difficulty focusing; would find it difficult to adapt to change; and would likely work at too slow a pace and make mistakes.  ECF Doc. 13, Page ID# 598.  McManus also argues the ALJ violated the treating physician rule by giving Dr. Lawrence's July 14, 2016 opinion no weight.  *Id.*

Evidence from doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  The ALJ must examine what work the treating source performed.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not

inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If an ALJ does not give the treating source opinion controlling weight, the ALJ must apply several factors to determine the weight to give the opinion, including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 416.927(c). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); *see also Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.*" *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)).

Here, Dr. Lawrence prepared an initial mental status questionnaire regarding McManus's mental limitations on April 12, 2016.  (Tr. 428-30)  Dr. Lawrence also completed a second mental impairment questionnaire on July 14, 2016.  (Tr. 499-500)  In his discussion of the medical record, the ALJ acknowledged that Dr. Lawrence was a treating source who had obtained an M.D. degree and had longitudinally evaluated and treated McManus.  (Tr. 21-24)

### 1. Dr. Lawrence's April 12, 2016 Opinion

The ALJ wrote the following in his analysis of Dr. Lawrence's April 12, 2016 opinion:

> The claimant was casually dressed and he had decreased eye contact.  He had a soft voice.  He was depressed.  Symptoms included sweating, tightness of chest, fast heart rate and shortness of breath.  The claimant did not trust people.  He has a hard time focusing when he reads or watches television.  His insight and judgment were fair.  He was diagnosed with major depression, generalized anxiety disorder, panic disorder and rule out social anxiety disorder.  Dr. Lawrence opined the claimant had a fair ability to remember, understand, and follow directions and in maintaining attention.  He has poor completion of tasks and difficulty with reading and watching television.  He is extremely uncomfortable in social situations and he tends to avoid social situations.  Dr. Lawrence opined the claimant would likely work at a slow pace and he would make mistakes.  I gave considerable weight to this opinion because it supports the marked limitation in social functioning.

(Tr. 23-24).  The ALJ "gave considerable weight to this opinion because it support[ed] the marked limitation in social functioning."  *Id.*

McManus argues that the ALJ's assignment of weight regarding Dr. Lawrence's opinions were "wholly incomplete" because the ALJ failed to provide analysis regarding why certain limitations were not included in the RFC.  ECF Doc. 13, Page ID# 598.  In particular, McManus argues that the ALJ did not address Dr. Lawrence's opinions that: (1) McManus's "ability to remember, understand, and follow directions, and maintain attention were only 'fair'"; (2) he "is poor at completing tasks, and has difficulty focusing"; (3) he "would find it difficult to adapt to change"; and (4) he "would likely work at too slow a pace and make mistakes."  *Id.*

The undersigned finds that the ALJ included mental limitations in McManus's RFC that adequately reflected the limitations at issue in Dr. Lawrence's April 12, 2016 opinion.  In his RFC determination, the ALJ limited McManus to "simple (routine) tasks," which addressed the limitations in McManus's ability to remember, understand, follow directions, and maintain attention, and his difficulty focusing.  *C.f. Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) (by limiting the claimant to simple tasks, the ALJ "include[d] a restriction on her ability to maintain concentration, persistence, or pace while performing simple tasks, and he further reduced the required attention and concentration by restricting her to routine and repetitive tasks.").  The ALJ also limited McManus to performing tasks "with no high production quotas or piece rate work," which addressed limitations in his ability to complete tasks and the likelihood that he would work at too slow a pace and make mistakes.  *C.f. Tolbert v. Comm'r of Soc. Sec.*, No. 1:13 CV 811, 2014 WL 1094378, at *3 (N.D. Ohio Mar. 18, 2014) ("particular limitations in the RFC concerning simple routine tasks, short instructions, without working at a production rate pace, were to 'account for the claimant's 'moderate' difficulties in maintaining concentration, persistence, or pace . . . .").  McManus's RFC also limits him to only having a "few workplace changes" and performing "simple (routine) tasks," which addressed the limitation that McManus would find it difficult to adapt to change.  *C.f. Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x at 437 ("A functional limitation to routine and repetitive tasks . . . provides structure and monotony so as to reduce work changes . . . .").  Dr. Lawrence's opinion also did not place functional limitations on McManus's ability to maintain pace when performing simple or routine tasks.  (Tr. 428-30); *see Blais v. Comm'r of Soc. Sec.*, No. 2:15-CV-3038, 2017 WL 489739, at *5-6 (S.D. Ohio Feb. 6, 2017) *adopted by* No. 2:15-CV-3038, 2017 WL 713762 (S.D. Ohio Feb. 23, 2017)).

24

Moreover, in his Step Three analysis, the ALJ expressly considered McManus's limitations in concentration, persistence, or pace, and found that McManus only had "moderate difficulties."  (Tr. 18)  McManus does not specifically challenge this finding, or point to any evidence in the record indicating it is not supported by substantial evidence.  Also, state agency psychologist consultants Drs. Malloy and Schwartzman found that McManus was only "moderately limited" in his capacity for sustained concentration and persistence.  (Tr. 68, 85-86)

The RFC determination that McManus could "perform simple (routine) tasks with no high production quotas or piece rate work" is also supported by state agency reviewing psychologists Dr. Malloy's and Dr. Schwartzman's opinions that McManus could "adapt to a setting in which duties are routine and predictable" and "carry out 1-4 step tasks in situations in which duties are relatively static and changes are explained ahead."  (Tr. 69, 86-87)

Although the ALJ did not adopt Dr. Lawrence's exact April 2016 phrasing, I find the limitations in McManus's RFC addressed Dr. Lawrence's concerns regarding McManus's ability to perform work.  *See Sisson v. Colvin,* No. 5:15-CV-552, 2016 WL 8671906, at *17 (N.D. Ohio Feb. 26, 2016), *adopted by*, No. 5:15 CV 0552, 2016 WL 3360509 (N.D. Ohio June 14, 2016); *Irizarry v. Colvin*, No. 1:13-CV-02161, 2014 WL 6879117, at *9 (N.D. Ohio Dec. 4, 2014); *Divins v. Astrue*, No. 3:11cv00033, 2012 WL 220246, *11 (S.D. Ohio Jan. 25, 2012) ("There is no requirement that the ALJ adopt the precise language offered by a medical source, as long as the ALJ's conclusion is supported by substantial evidence.").

### 2.    Dr. Lawrence's July 14, 2016 opinion

McManus also argues the ALJ violated the treating physician rule by giving Dr. Lawrence's July 14, 2016 opinion no weight.

The ALJ analyzed Dr. Lawrence's July 14, 2016 opinion as follows:

The claimant was diagnosed with major depression, generalized anxiety disorder, panic disorder, and rule out social anxiety.  The claimant had a depressed affect, decreased eye contact, social panic, depressed and anxious mood, and he was paranoid.  The claimant was seriously limited, but not precluded, to unable to meet competitive standards in sustained concentration and persistence; understanding and memory; social interaction; and adaptation.  Due to his impairments or treatments, he would be absent four days of work per month.  He would be off task 50% of the time.  I assigned no weight to this opinion because missing work and being off task is not supported by the preponderance of the evidence or Dr. Lawrence's progress notes.

(Tr. 24)  The ALJ assigned no weight to Dr. Lawrence's July 14, 2016 opinion based on the

single-sentence conclusion that, "missing work and being off task is not supported by the

preponderance of the evidence or Dr. Lawrence's progress notes."  (*Id.*)

McManus argues that there is ample evidence in the record to support Dr. Lawrence's

opinion that McManus would miss work and be off task.  ECF Doc. 13, Page ID# 599.

McManus also argues that the ALJ failed to address or explain why he rejected the remaining

limitations in Dr. Lawrence's report, including the limitations regarding his inability to complete

a normal workday or workweek without interruption from psychologically-based symptoms, his

inability to interact appropriately with the general public, and the many areas in which he is

"seriously limited" or "unable to meet competitive standards."  ECF Doc. 13, Page ID# 599

(citing Tr. 67-69, 368, 418).  I agree.

The ALJ assigned no weight to Dr. Lawrence's opinions that McManus would be off task

50 percent of the time and would be absent from work four days per month based on his

conclusion that these opinions were not supported by the preponderance of the evidence or Dr.

Lawrence's progress notes.  (Tr. 24)  The court notes that the majority of the evidence regarding

McManus's mental impairments *comes from* Dr. Lawrence's treatment notes.  Other than a few

treatment records of McManus's primary care provider, Dr. Behmer (Tr. 263, 266), and the

opinions from the state agency psychologists, Dr. Lawrence's treatment records and opinions

constitute the majority of the medical evidence regarding McManus's mental impairments. Dr. Behmer noted on at least one occasion that McManus appeared anxious and depressed. (Tr. 266) State agency consultative examiner, Dr. Koricke, opined that McManus may demonstrate difficulty with judgment while in the workplace due to depression and anxiety and that he lacked the judgment and insight to function appropriately in the work setting based on his work history and his behavior during the interview. (Tr. 368-69) The ALJ failed to provide any explanation as to how this evidence did not support Dr. Lawrence's July 14, 2016 opinion.

The ALJ also did not specify which of Dr. Lawrence's progress notes he found to be inconsistent with her July 14, 2016 opinion. In that opinion, Dr. Lawrence opined that McManus would be off task and absent from work based on her diagnoses that McManus suffered from depression, general anxiety disorder, panic disorder, and rule out social anxiety disorder and her clinical findings of depressed affect, decreased eye contact, depressed and anxious mood, paranoia, and speaking in a soft voice. (Tr. 499) Dr. Lawrence's treatment notes indicated that McManus reported he experienced irritability, worry, anxiety, low energy and motivation, panic attacks, and other symptoms. (Tr. 399, 405, 505, 507) Dr. Lawrence noted McManus reported that his slow speed, inability to follow instructions, and anxiety negatively affected his job performance at Goodwill. (Tr. 503, 505, 509) Nothing in Dr. Lawrence's notes remotely suggest that she did not fully credit McManus's reports. Instead, her records reveal an ever increasing and varied course of pharmacological care in order to treat these reported conditions. Contrary to the ALJ's unsupported assertion, Dr. Lawrence's treatment notes appear to support or are at least consistent with her July 14, 2016 opinion.

The commissioner offers a number of insufficient reasons that the court should nonetheless accept the ALJ's explanation. The commissioner argues that the ALJ properly gave

27

no weight to Dr. Lawrence's opinion because McManus's physician's treatment records show that McManus was reliable. ECF Doc. 14, Page ID# 624. The commissioner argues McManus was able to make 95 percent of his appointments and his employment records indicate McManus only had two attendance related issues. *Id.* (citing Tr. 181, 419). The commissioner cites to a daily activities questionnaire prepared by counselor Kandice Dietrick that stated McManus "is reliable 95% of the time," but would be prevented from doing work activities due to his "poor attendance, lack of motivation, extreme fatigue from major depression, poor focus and concentration." (Tr. 418-19) The commissioner's arguments regarding McManus's attendance while employed at Goodwill appear for the first time in the briefing now before the court. This Court may not accept the commissioner's *post hoc* rationalizations for agency action, because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Johnson v. Comm'r of Soc. Sec.*, 193 F. Supp. 3d 836, 847 (N.D. Ohio 2016) (quoting *Berryhill v. Shalala*, 4 F.3d 993 (6th Cir.1993). The ALJ never articulated McManus's Goodwill attendance as a basis for discounting Dr. Lawrence's July 2016 opinion. If the ALJ intended to imply that he was relying on the Goodwill work history, then he has failed to build a logical bridge between the record and his conclusions.

The commissioner also argues that the record does not support the finding that McManus would be off task most of the time, because he was able to drive, live alone, shop for groceries, attend appointments, and record some television shows. ECF Doc. 14, Page ID# 625 (citing Tr. 38, 47, 407, 419-19). The commissioner notes that on November 12, 2015, treating physician Dr. Behmer found that McManus's generalized anxiety disorder was doing well. *Id.* at 625 (citing Tr. 390). The commissioner also argues that neither Dr. Koricke's nor the state agency psychologist's opinions suggest that McManus "had difficulty tracking or maintaining attention

28

during examination" or "would be absent four or more days a week or be off task more than 50 percent of the time." *Id.* (citing Tr. 23, 67-70, 84-87, 366, 368). The court notes that neither Dr. Koricke nor Dr. Schwartzman had the benefit of Dr. Lawrence's treatment notes or counselor Dietrick's daily activities questionnaire that were prepared in 2016. Dr. Malloy did not have access to Dr. Lawrence's treatment notes from May to September of 2016. (Tr. 488, 490, 503, 505, 507, 509). In fact, the ALJ discounted the weight given to the opinions of Drs. Schwartzman and Malloy for this reason.

The purpose of the "good reasons" requirement is two-fold. First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly when a claimant knows that her physician has deemed her disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson,* 378 F.3d at 544. In this case, the ALJ failed to provide an adequate explanation for his handling of Dr. Lawrence's July 2016 opinions.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion is "harmless error." This occurs when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though [he] has not complied with the terms of the regulation." *Wilson,* 378 F.3d at 547; *see also Cole,* 661 F.3d at 940. In the last of these

29

circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. App'x 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. App'x at 551.

Here, the ALJ's stated reasons for rejecting the July 2016 opinions of McManus's treating physician are inadequate.  Moreover, the court cannot determine whether the ALJ fully considered the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6), including whether the medical evidence in the record as a whole supported Dr. Lawrence's opinion.  For these reasons, the undersigned finds that the ALJ's failure to provide sufficiently specific "good reasons" for rejecting Dr. Lawrence's opinion regarding McManus's limitations was not harmless error. Even if good reasons existed to reject the treating physician's opinion, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review.  The court should reject the ALJ's determination regarding the Dr. Lawrence's treating source opinion.

Had the ALJ assigned controlling weight to Dr. Lawrence's opinion, McManus's RFC determination would have been different.  I recommend remand so that the ALJ can properly evaluate Dr. Lawrence's opinion.

### C.     The ALJ Failed to Properly Evaluate the Opinions of Dr. Koricke

McManus makes similar arguments regarding the ALJ's handling of Dr. Koricke's

opinion to those he made regarding the ALJ's analysis of Dr. Lawrence's opinions.  McManus

argues that it is "unclear how the ALJ incorporated Dr. Koricke's opinion into the RFC."  ECF

Doc. 13, Page ID# 600.  The undersigned agrees.

Dr. Koricke is a non-treating source and the reason-giving requirement of the treating

source rule is inapplicable to her opinion.  *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255,

259 (6th Cir. 2016), *reh'g denied* (Sept. 20, 2016); *see also Smith v. Comm'r of Soc. Sec.*, 482

F.3d 873, 876 (6th Cir. 2007).  Nevertheless, the ALJ must weigh the opinion of agency

examining physicians under the same factors as treating physicians, including the supportability

and consistency of those opinions.  *See* 20 C.F.R. § 404.1527(c).  "Although th[e] explanatory

requirement does not apply to opinions from physicians who . . . have examined but not treated a

claimant, the ALJ's decision still must say enough to allow the appellate court to trace the path

of his reasoning."  *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011)

(internal quotation marks and citations omitted).  "Thus the question is not one of 'good

reasons,' but rather whether the ALJ's reasoning in this regard is supported by substantial

evidence."  *Marotta v. Comm'r of Soc. Sec.*, No. 1:16 CV 1169, 2017 WL 3065273, at *7 (N.D.

Ohio July 19, 2017).

The ALJ stated that he gave weight to Dr. Koricke's opinions to the extent that they

helped persuade him that McManus's residual functional capacity need not contain any

restriction greater than, or in addition to, those stated in the ALJ's RFC Finding #5.  (Tr. 23)

The ALJ stated that he did so because Dr. Koricke's opinions "were consistent with his [*sic*]

clinical findings and he [*sic*] is an expert in Social Security disability evaluation (20 CFR

31

404.1527).” (*Id.*)  However, the ALJ did not address the portions of Dr. Koricke's opinions that were inconsistent with the ALJ's RFC determination, including Dr. Koricke's opinions that McManus will likely have difficulty recalling what needs to be done in the work place to follow through with completing tasks, that he may demonstrate difficulty with judgment due to depression and anxiety, and that McManus "lacks the judgment and insight required to function appropriately in a work setting."  (Tr. 368-39)  It appears that the ALJ improperly selectively parsed the record and "cherry picked" only the portions of Dr. Koricke's opinion consistent with the ALJ's RFC determination.  *See Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (An ALJ "may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."); s*ee also Germany–Johnson v. Comm'r of Soc. Sec*., 313 Fed. Appx 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports" and failed to adequately address the findings of the treating physician).

The undersigned finds the ALJ's failure to say enough to allow the court to trace the path of his decision not to incorporate the non-credited portions of Dr. Koricke's opinions into the RFC was error.  Moreover, the omitted portions of the Koricke opinions were quite consistent with the portions of Dr. Lawrence's opinions to which the ALJ assigned no weight.  The ALJ should have done much more to signify to the claimant and future reviewers how he decided to disregard this congruent, salient evidence.  The court should find that the ALJ's determination regarding Dr. Koricke's opinion was erroneous and provides a basis for remand.

### D.     The ALJ Failed to Properly Evaluate the Opinions of the State Agency Psychologists

The ALJ gave less weight to state agency psychologists', Dr. Malloy's and Dr.

Schwartzman's, opinions regarding McManus's non-exertional limitations.  (Tr. 24)  The ALJ stated that "the evidence as a whole, including medical evidence submitted after the State Agency review, shows that the claimant's impairments impose additional and greater limitations."  (Tr. 24)

McManus argues that although the ALJ indicated his RFC finding imposed greater limitations than those in the Dr. Malloy's and Dr. Schwartzman's opinions, the RFC failed to account for many of the moderate limitations the psychologists identified in areas such as McManus's ability to perform activities within a schedule and maintain regular attendance and to be punctual within customary tolerances.  ECF Doc. 13, Page ID# 601.  McManus also argues that the ALJ failed to address McManus's need for flexibility in his work schedule, breaks, and pacing.  *Id*.  The commissioner counters that because an ALJ need only include those limitations he finds consistent with the record as a whole, one can reasonably inter that if the ALJ did not include a specific limitation in the RFC, the ALJ did not find that the evidence warranted that the limitation be included.  ECF Doc. 14, Page ID# 627.  Although it is true that an ALJ need only include those limitations he finds consistent with the record as a whole, the ALJ must also provide sufficient analysis to allow the court to trace the path of his reasoning.  *Stacey*, 451 F. App'x at 519.  The ALJ failed to do so here.

The undersigned finds that the ALJ's failure to discuss why he excluded some of the limitations indicated by these experts from the RFC failed to build a logical bridge between his findings regarding their opinions and the RFC he formulated.  Although the handling of these opinions would not likely have provided a basis for remand standing alone (because the ALJ adequately explained why he limited the weight to be given the opinions), a re-examination of the case upon remand should include a re-evaluation of whether the limitations determined by

33

the state agency psychologists should be incorporated in a revised RFC. I recommend that the order of remand include an instruction to re-evaluate all of the opinion evidence in this matter.

###### E. The ALJ Failed to Properly Address McManus's Limitations Regarding Interactions with Supervisors in the RFC

McManus argues the ALJ's decision not to include McManus's limitations regarding interactions with supervisors in the RFC was not supported by substantial evidence. ECF Doc. 13, Page ID# 596. I agree.

McManus reported to Dr. Koricke that he was unable to work because his conditions caused him to have difficulty getting along with supervisors. (Tr. 364) McManus testified that he was defensive and paranoid, which made him unable to get along with supervisors and coworkers. (Tr. 46) Dr. Lawrence opined that McManus was seriously limited, but not precluded and Dr. Malloy and Dr. Schwartzman opined McManus was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 69, 86, 500) However, the ALJ did not provide any reasons regarding why he declined to include any limitations in the RFC regarding McManus's inability to interact with supervisors.

As discussed above, the undersigned finds that the ALJ's failure to provide "good reasons" for rejecting Dr. Lawrence's opinions or to explain why many of the limitations identified by Dr. Koricke and the state agency psychologists were not incorporated in the RFC was non-harmless error.

The specific handling of McManus's alleged inability to deal with supervisors exemplifies the problem. The issue is whether the RFC limitations (that McManus should be limited to performing "simple (routine) tasks with no high production quotas or piece work"; "low stress work," and "superficial interaction with the public and co-workers") are sufficient to capture the limitations found in the medical source opinions or the ALJ's own finding that

34

McManus had marked limitations in social functioning.  (Tr. 18).  The ALJ has not made this

clear.  Moreover, the RFC doesn't seem to account for Dr. Koricke's finding that McManus

"lacked the judgment and insight to function appropriately in the work setting" based on his

work history and behavior during the interview; or her finding that "[h]e presented shy today and

was not fully able to gain appropriate rapport based on his avoidant personality disorder, and

depression/anxiety."  On the one hand, the ALJ makes much of the fact that McManus was

cooperative and persistent throughout his interview with Dr. Koricke, but on the other he

completely failed to account for the fact that despite these positive notations McManus had not

been able to establish "appropriate rapport" with her.  It stands to reason, but the ALJ did not

discuss, the real possibility that McManus can get by in a doctor's office setting but be woefully

unable to handle the stresses of the workplace.  Nothing in the ALJ decision makes it clear if he

considered whether doctor's office conduct is equivalent to what can be expected while being

supervised at work.  I recommend remand on this ground as well.

### F.  The ALJ Properly Addressed McManus's Limitations Regarding His Panic Attacks

McManus argues that the ALJ erred by not including a limitation in McManus's RFC

regarding his "daily panic attacks" and "need to absent himself (or be off tasks) for the duration

of the attack."  ECF Doc. 13, Page ID# 602.  The only evidence McManus points to in support of

his argument is the VE's testimony in response to McManus's attorney's questions.  *Id.* (citing

Tr. 56-57).  The commissioner counters that "the record does not establish that plaintiff would

have a 30-minute panic attack during the workday, each and every day, particularly in a low-

stress, minimal interaction working environment contemplated by the RFC (Tr. 19, 55)."  ECF

Doc. 14, Page ID# 627.

35

The ALJ noted that on several occasions McManus reported having panic attacks.  (Tr. 19, 40-42, 399, 405, 411, 423, 488.)  Dr. Lawrence diagnosed McManus with panic disorder and found that his symptoms were "moderate."  (Tr. 21, 402)  McManus reported his panic attacks usually occurred five or fewer time a week during the night (Tr. 19, 22, 23, 423, 505), but that Vistaril helped his panic attacks to some degree.  (Tr. 22, 488)  Before his Social Security hearing, McManus reported having about four panic attacks a day, usually at night.  (Tr. 23, 509)  McManus testified that he had panic attacks at work while working at Goodwill and Moen.  (Tr. 42)  He stated that when he had panic attacks at work he would go into the bathroom and remain there until he could recover.  (*Id.*)

"[A]n ALJ is not required to rely on VE testimony as to limitations that the ALJ does not find credible and does not include in his RFC determination."  *Clinkscales v. Astrue*, No. 5:10CV798, 2011 WL 3862088, at *10 (N.D. Ohio Aug. 31, 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993)).  The evidence regarding McManus's panic attacks generally consisted of McManus's self-reported symptoms.  As explained above, the ALJ found that McManus was not entirely credible and "the objective evidence does not support his contentions regarding the severity, chronicity, and/or frequency of his symptoms."  (Tr. 20)  None of the medical experts opined that McManus would need to absent himself or be off task due to his panic attacks.  Although Dr. Lawrence, McManus's treating psychiatrist, diagnosed him with panic disorder (Tr. 401-02), she did not list his panic attacks as one of the clinical findings demonstrating the severity of his mental impairments and symptoms.  (Tr. 499)

The undersigned does not find that a remand is warranted based on the ALJ's analysis of McManus's panic disorder in isolation.  Nevertheless, because I am recommending remand

based on the ALJ's analysis of the medical source evidence, I recommend that the question of whether the ALJ adequately handled the analysis of McManus's panic disorder be re-evaluated as well.

## VII.    Recommendations

Because the ALJ failed to properly (1) apply the treating source rule, (2) evaluate the opinions of the state agency examining psychiatrist and state agency reviewing psychologists, or (3) address the claimant's limitations regarding interactions with supervisors, I recommend that the final decision of the Commissioner be VACATED and this matter be REMANDED pursuant to 42 U.S.C. §405(g).

Dated: April 9, 2018

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).